Our next case is United States v. Charles Williams. Mr. Breckinridge or Professor Breckinridge. Good to have you here sir. Your Honor, Tillman Breckinridge on behalf of the William & Mary Appellate and Supreme Court Clinic. I'm here to introduce Amber Will, a third year law student at William & Mary to argue for the appellant. Thank you sir. Ms. Will, it's good to have you. Thank you very much. Good morning, Your Honors, and may it please the Court. My name is Amber Will and I represent the appellant, Mr. Charles Williams, Jr. I would like to reserve three minutes for rebuttal, if I may. This Court should overturn Mr. Williams' conviction and suppress the evidence based off of two alternative legal reasons. First, as the District Court noticed, there were two distinct Terry stops in this case. And thus, the police officers should be required to have new articulable reasonable suspicion in order to justify the second stop. Alternatively, even under a one-stop analysis, the police officers still need objective reasonable suspicion. Under our precedent, you've got to deal with the whole of everything, don't you? You have to look at all the evidence. In United States v. Foreman, Your Honor, this Court held that you don't need to ignore the evidence from the first stop when looking at the second stop. However, the question in United States v. Foreman was regarding one continuous fluid stop analysis rather than a two-stop analysis. Do you think this was a two-stop? Correct, Your Honor. Because there are two cars? Or why is it two stops? No, Your Honor. The two-stop analysis is based off of a reasonable person when they feel free to leave and when they are feeling detained. That's the standard that's held in Arizona v. Johnson in which one stop is considered ended and one stop is considered begun again. It's not based off of the two cars that were involved. What was the first stop here? How do you define these two stops? The first stop, Your Honor, is the traffic stop. The traffic stop in which Mr. Williams was pulled over originally by Deputy Russell for speeding on Interstate 85. That stop specifically ends at 1254 and 51 seconds when Mr. Williams is handed back his driver's license, the car rental agreement, and the warning ticket that was issued. It's evidenced by the video that Mr. Williams starts to lean out of the car at this point in time, showing that he felt free to leave. And Deputy Russell testified that at that point in time, Mr. Williams was free to leave. He, however, Deputy Russell, however, asked Mr. Williams a series of questions then about searching the vehicle. And he stayed around there and talked to him? Yes, Your Honor. Mr. Williams did lean back into the car to answer Deputy Russell's questions. However, although a police officer has the ability to ask these types of questions, it's not considered consensual when a reasonable person would not feel free to leave. Therefore, in this situation, because Mr. Williams was already in the patrol car, he was surrounded by both Deputy Russell to his left in the patrol car, Sergeant Soles was standing outside of the passenger door blocking his immediate direct leaving, Mr. Williams did not feel free to leave. And the other car going on then? The first car that was pulled over, Your Honor? Yes. Yes, that car had been given a warning and was able to drive away. Okay, but aren't you in a somewhat contradictory situation because you're saying he was free to leave, but then he wasn't free to leave? Correct, Your Honor. How much time are you saying elapsed between the time that he was free to leave, because the officer had issued the warning, and the time that he wasn't free to leave, creating the problem as you see it? It's a period of six seconds, Your Honor. The fact that it's only six seconds does not indicate that this was one stop. It still is based off of this reasonable person standard, and a reasonable person in Mr. Williams' situation would no longer feel free to leave when asked this line of questioning. Therefore, the district court specified on pages 308 and 311 of the joint appendix that the traffic stop did end when Mr. Williams received all of his documentation back. Therefore, the line of questioning would indicate the second stop, and other circuit courts have held that new reasonable articulable suspicion needs to be evidenced between those two stops to justify a second stop. Now, in Foreman, though, we didn't engage in a one-stop, two-stop analysis specifically, did we? Correct, Your Honor. No. The district court in Foreman did, but we didn't. Yes, Your Honor. And this court looked specifically to the Tenth Circuit for guidance when looking at United States v. Foreman and how to decide that case. In the Tenth Circuit, they looked at United States v. Williams of that circuit, which had one continuous stop. However, if that case in the Tenth Circuit had two-stop analysis, they would have been bound by the precedent in United States v. Peters that specifies that new reasonable articulable suspicion needs to be evidenced between the two stops. And I agree with you, at least to the extent that this is a close case. Yes. But what is so suspicious about this case, and I watched the video, is this business driver's license at the business post office box that was given. And listening to that tape and seeing his reactions, the police officer was clearly trying to get him to say something about where he lived. Correct, Your Honor. And he was talking about, the police officer saying, you live in New Jersey with your girlfriend. He said, this is just a post office box address, it's not an address. And it's pretty clear Williams was not going to give him any kind of residential information. Why isn't that suspicious? Well, Your Honor, in a continuous stop analysis, the district court held that was one factor of reasonable suspicion. But to me, that's a really significant factor. I mean, I don't put particular stock in the fact this is a rental car. A lot of people rent cars, particularly city dwellers. And I think people your age much more so than people my age rent Zip cars and everything else. Yes. But it's pretty odd to use your employer's post office box for your driver's license. To me, that's just a huge red flag. So why isn't that really suspicious? In the video, Your Honor, it also looks that Mr. Williams is thinking that this ticket is going to be mailed to him. And that Deputy Russell tries to say, no, I'm not mailing this. It's just to put it down as an address for the warning ticket. So arguably, Mr. Williams gave the post office box address because that's where he received his mail from, rather than having it delivered to a residential address. However, even though that has been held as a factor that this court can consider reasonably suspicious, it doesn't indicate any kind of criminal activity. And Deputy Russell let Mr. Williams go already knowing that information. He gave him the ticket. He didn't do any further investigation of where he lived exactly, where his girlfriend had lived in New Jersey, or ask any more continuous follow-up questions regarding that specifically. He told the police officer, if I recall correctly, that he was on his way to shop. Correct, Your Honor. And the rental car was due back the next day in New Jersey, New York. I don't remember where. It was obviously going to be late getting back. Correct, Your Honor. To be turned in. It would be late, Your Honor, getting back if it hadn't been renewed. Mr. Williams did specify in the video that he was planning on renewing the rental agreement when he had arrived in Charlotte. And the rental car was from Hertz, a national chain, and the agreement specified that the people would not have to notify Hertz within two days whether or not they wanted to extend the agreement. There was some also explanation that Mr. Williams' brother and his wife had been getting into an argument, so it was unclear how long they would be able to spend in Charlotte. So it shows why the car rental agreement may have been set to expire during that time rather than when they may originally have thought that they would be heading back to New Jersey. What about the slightly different explanations that the brother and Mr. Williams gave? I mean, the brother told the police that Mr. Williams and his girlfriend were traveling to Charlotte as a potential place to live, right? The girlfriend said they were just on vacation, and Mr. Williams never said he was thinking about moving to Charlotte. So weren't there some inconsistencies there that would support finding a reasonable suspicion? No, Your Honor. In Sergeant Soles' video, the brother in the first lead car specified that they were traveling together, but I do not believe that there is any indication that he was looking for a place to live in Charlotte. I thought the brother said that. The brother didn't say that he and the girlfriend, that Mr. Williams and his girlfriend were thinking of moving to Charlotte and they were looking at a potential place to live? Of my recollection, Your Honor, I don't remember that specific scenario. However, even if that was the case, it wasn't inconsistent stories. The stories were consistent between all of the people involved that they were traveling to Charlotte. They were just some people were offering more information than others. And the officer that was talking to the brother was the one that got crossed up on his testimony, wasn't he? Correct, Your Honor. Sergeant Soles first testified. His testimony at the first hearing was what? Discounted or was contradicted by what showed up on the video just before the trial? Four or five months later? Yes. The first hearing established Sergeant Soles testifying that the brother denied traveling with Mr. Williams' vehicle. He did not acknowledge the fact that they were together at all. However, when the video surfaced of Sergeant Soles' patrol cam, it's clearly shown that he did admit that they were together. He said that we were together and that they were traveling to Charlotte together. And so that was discounted in the second hearing. Does each factor that the officers considered after independently indicate criminal activity going to be taken together? No, Your Honor. In a one-stop analysis, it's a totality of circumstances test established by the support in United States v. Vaughn. However, in United States v. Johnson, this court specified that the factors together need to indicate some kind of sinister activity. And the four factors relied upon by the district court are simply that Mr. Williams was driving at night, that he was driving on Interstate 85, which is a known drug corridor, but he was driving… Did they talk about what direction he was going in? He was driving… I know, but was the direction they were going make it a suspect? No. I've heard them come in here and they say if you're going north, that makes you a suspect because you're going to a destination city. If you're going south or something, you're going to a source city. Correct, Your Honor. So if you're driving down the interstate, particularly if you're in an SUV or dark windows on it or something, you're a suspect. Correct, Your Honor. There are reasonably suspicious factors. But you can't just consider that alone. I mean, Judge Floyd and I drive up here to court in those big SUVs. That could then, based off of these factors, be reasonably suspicious, Your Honor. The fact that he was driving on Interstate 85 is not reasonably suspicious. But is the direction we're going more likely to get stopped going home or coming to court? It should make a difference because… It shouldn't make a difference? It should, Your Honor. It should? Yes, because that indication of the direction that you're traveling shows whether or not you're coming from a drug hotspot or a source. At the time of day, too. I'm a suspect here because it was the middle of the night, 1230 in the morning. Correct, Your Honor. If you're on a highway in the middle of the night, you're a suspect, too. Correct. And then the post office box address and the rental agreement. Those were the four factors that the district court relied upon to be reasonably suspicious. Okay, but we're not limited to the district court's analysis of the facts. I mean, if we find there are other circumstances that come into the basket of reasonable suspicion, we're not bound to what the district court thought was most compelling, are we? No, Your Honor. You're not bound to what the district court ruled upon. But based off of the factual record that we have, there are really no other indicators of reasonable suspicion in this case. And this court has held in its past precedent cases of similar nature in which reasonable suspicion were found. There were clear indications of sinister activity. In United States v. Mason, the defendant had excessive air fresheners in the car that would hide any drug odors. They had lied or told inconsistent stories to the police officers and had excessive signs of nervousness. In United States v. Brandt. But air fresheners really, I mean, they have no consequence when you're talking about cocaine. I mean, they might be for marijuana. Correct, Your Honor. So I'm not sure that's really relevant here, is it? It's relevant, Your Honor, in just showing that it would be a kind of factor. That would be more likely. That would be more likely. If there had been air fresheners, but not the absence of air fresheners indicating anything. Correct, Your Honor. Same thing in United States v. Brandt. We had, again, excessive nervousness, inconsistent stories, and the excessive amount of air fresheners. In United States v. Vaughn, we had some excessive nervousness as well, and we also had prepaid cell phones. Here you said the judge found that he wasn't nervous. Correct, Your Honor. The district court found that he was not exceedingly nervous. So it would be a factor in your favor. Correct. There were none of these indications of any of these kind of factors of sinister activity. The government, furthermore, is supposed to provide. We don't really find that. Most of them are always nervous. I mean, in the. Within the patrol car. In the record, they're nervous. Correct, Your Honor. And there are no physical signs of nervousness by Mr. Williams, at least not exceedingly nervous. That would make him suspicious. To me, it's perhaps more remarkable if you're not nervous sitting in a police car. I mean, that doesn't cut either way. Well, he may have. The district court recognized that there were signs of nervousness, just not the signs of nervousness that have typically been held by this court as excessive, such as shaking hands, avoiding eye contact. The case isn't going to rise and fall on you. The nervousness factor, no. But the government is supposed to be able to show you a case that shows reasonable suspicion based off of factors that are similar in nature of such a flimsy quality that we have here today. However, the government even points to cases that have more sinister factors available in the record. In United States v. Newland, there were 11 suspicious factors, including the fact that the defendants flew to Miami and then drove back from New York, indicating that drug corridor mentioned previously. They exited the highway before a known checkpoint and then lied to the police officers about why they did so. And in United States v. Bruegel, the defendants gave the police officers a fake ID. All of those factors are much more sinister in nature than any of the factors that we have presented here in this case. Well, would a substantial portion of innocent people exhibit the combination of factors present in this case? Not necessarily these four factors, Your Honor. However, these four factors are of such a benign nature, of such a quality, that police officers at this standard would be able to point to four various other factors that would be of similar nature and say that's reasonable suspicion. These four factors have been held by this court as allowed to be in the analysis for reasonable suspicion, but these four factors alone do not indicate any kind of criminal activity. How about the delay here? The delay in what, Your Honor? Well, the delay in getting the dog sniffer up there. In getting the dog sniff, that just extended the traffic stop and the United States Supreme Court in Rodriguez specified that if— Well, that takes care of the alternative, the de minimis argument, right? Correct, Your Honor. That takes it out of here, but it's still— License back in these warning tickets until they did the dog sniff. It was 2 minutes and 34 seconds, Your Honor. 2 minutes and 34 seconds. Correct. So that timing, again, just prolongs the detainment of Mr. Williams under a one-stop analysis. How long? Have we approved him longer than that? This court had approved slightly longer than that in other cases, Your Honor, but again in Rodriguez— Before the law changed. Before the law changed, yes. But in United States v. DiGiovanni, this court focused on both the scope and the duration and did not specify that the timing was the pertinent factor in that case. Under a one-stop analysis, this court should look at the totality of circumstances presented, but this does not rise to the level of any kind of sinister activity. However, under a two-stop analysis, the police officers can only regard the totality of circumstances or they should only regard the totality of circumstances if there is some kind of new evidence that arises between the first and the second stop. Since there is no new observations that could have existed in those 6 seconds, there was no reasonable suspicious activity to justify extending the stop or making a second stop to Mr. Williams. Therefore, his Fourth Amendment rights were violated. If we conclude that this is a single stop, do you win or lose? I see my time is up. You can answer your question. If this is a single stop, Your Honor, no, we do not lose. Under a single stop analysis, again, it's the totality of circumstances and the argument is that there needs to be some factor of sinister activity involved. Thank you, Your Honors. Thank you. You have some time, reservedly. Mr. Monike? Go right ahead, sir. I'm sorry. Thank you, Your Honor. Good morning. May it please the Court. My name is Terry Monike and I represent the United States in this matter. The district court did not err in denying appellant's motion to suppress on the basis that sufficient reasonable suspicion existed to support the search of the vehicle. And if I could, I'd like to start with an analysis of the factors the district court found compelling in reaching that conclusion. Just before I get to that, though, I think it's important to note that from the very outset of the interaction between the law enforcement officers and appellant, there was strange or suspicious behavior. You will recall that as soon as he was stopped during that interaction with Deputy Russell, the first thing that came up was, where can I find a bathroom? I need to use the bathroom. Can you tell me where there's a bathroom? And that struck the officer as odd as he testified during the hearing because just a few miles before the location of the vehicle. When you say the officer, you're talking about Russell? Yes, Russell, Deputy Russell. Just a few miles before the traffic stop was initiated, the appellant had passed a rest area with a bathroom. Then, just a few minutes further into their interaction, when appellant was asked what his destination was, he told the officers it was Raleigh. And that struck the officers as strange because he'd passed Raleigh about 100 miles back up the road. Now, it's true that the appellant eventually corrected himself and said, I mean, I'm going to Charlotte, but I think it's important given the context of the case that's before the court today that from the very outset, the appellant's behavior struck the officer as odd or suspicious and justifiably so based upon those two topics of discussion. These officers were riding around with the drug dog, too. I mean, they were looking. There's no question that Deputy Souls in particular was part of the interdiction team. They were going to sniff these cars when they stopped them anyway, weren't they? I wouldn't go that far, Your Honor. Well, they said there was one of them testified that, see if you can get a violation on your own, and if not, we'll use one of mine. That's true. That is what they said. That sure sounds like they were going to sniff it. Could be, as we all know. They said that happened before they stopped them. That's true, Your Honor. As we all know, there's nothing wrong with pretextual stops. But they were going to do it. That's what that sounds like. It does sound like that, Your Honor. I'm only fighting back on the part that nobody actually testified to that during the hearing. They were part of an interdiction team, and that was the conversation that took place. Well, where did that come from? The video? That came off the video. The conversation? That quote that I read. Yes, sir. It's in the record here, page 290. Yes, sir. And there was some conversation, I think, on cross during one of the hearings where one of defense counsel elicited... What makes it sound like they weren't going to get... He wasn't going to let them leave. He wasn't going to let Williams leave until they... He was trying to get consent, and he asked him several times for consent, and he finally...William finally said no. And immediately after he said no, he decided to get the doggies and do the sniff. It is true that... That's the way the record reads. Yes, sir, that they preferred to obtain consent... Well, sure they did. ...to avoid this entire situation that brings me up here to visit with them. Before they stopped them, they knew they were going to find some reason to do a search. I would phrase it this way, Your Honor. I think it is true that they wanted to search the vehicle. They would not have searched the vehicle had they not developed sufficient reasonable suspicion to justify the search of the vehicle. But it's not...You know, you talk about reasonable suspicion, and I think we forget the rest of that phrase. It's reasonable suspicion of criminal activity. Yes. Okay? Where's the... I mean, I understand hunches and, yeah, these guys are driving late at night, and they're, you know, driving in tandem and everything else, but what's reasonable suspicion of criminal activity here? That maybe... The man said he needed to use the bathroom. They're in a rental car. A lot of people rent cars. They were driving at night. They had a baby in one of the cars. Lots of the young people drive in cars at night because the babies will sleep. They travel at night. Where's this reasonable suspicion of criminal activity? It's early in my argument, Your Honor, so I hesitate to say this, but that could be the most difficult question that I ask during my time here. If we had a good definition for what reasonable suspicion is or is not, it would make my life a lot easier. Criminal activity. Criminal activity. It's a combination of the factors that is about what I was going to go through. The appellant's argument is that it's sort of a check the block approach. We have travel on a drug corridor, we have a rental vehicle, and we have an individual that won't give an address without any further context or illumination of the other evidence. They gave you his employment address. They gave his employment address. You think that was suspicious? It was suspicious in and of itself, and in the larger context. Well, the marshal service tells the judges, use our employment address. Don't use your home address. That's what they tell us. Yes, sir. Yes, sir. Well, that's as I would argue. I'd be suspicious. I'd get stopped by the police. No, sir. I'd tell them it's 10th and Main Street in Richmond. No, sir. And I won't give law enforcement officer your information based upon what you just said. I'm sure the marshals don't consider it secret. They just want us to be careful. Yes, sir. But it's a different context. But it would be a suspicious circumstance if a law officer didn't know that I was a judge or something. It depends on the context, and that's the answer to all of these questions that arise when we're discussing reasonable suspicion here. The court has already addressed it with opposing counsel. It's very clear from watching the video that the officers thought they were going to get a home address and attempted many times to get a home address from the appellant. And despite those efforts, he either refused or was unwilling to provide that address. Well, they never said, please give me your home address. And that's why I watched the video, because I think that's really the most suspicious part is these two work post office boxes. People generally don't do this. But the officers never said, give me your residence address. The officers were intimating, trying to get him to say a residence address. And he clearly wasn't biting. But they never said, give me your residence address, and he refused. So when you say he refused, I don't think that's accurate. But what I meant was it's impossible to tell on the record whether or not the defendant truly couldn't pull up in his mind where he lived. Well, he never stated, but he was never asked to give his residence address. Isn't that correct? My recollection is that the officers asked him where he lived. They may not have asked him, where do you reside? And referred to the license and said, that's not a street address. All these things suggesting that they wanted him to give a street address, but they never said, please give me your residence address. They never did. I won't argue with the court about that, Your Honor. I think the fact remains the same, that not only did he not give them a residence address, but the activity was more suspicious than that because the P.O. box that he provided didn't match, and the district court pointed this out, didn't match the P.O. box that was listed on his New York driver's license. And on top of that, the appellant, I'll paraphrase, basically what he told the officers was that he split his time between his home, which I believe was in New York, and the passenger's home, which was in New Jersey. So of all the questions, perhaps other than one's name, that you ought to be able to provide to law enforcement when they interact with you, it should be where you live. And here the appellant had more options than most of us. Well, I'll just speak for myself. I have one address. That's where I live. He had two different addresses that he reasonably could have provided to them, but he provided neither. So it's not just that he couldn't or wouldn't provide an address, but what he provided was inconsistent with his driver's license and it was inconsistent with the information that he provided about himself and Ms. McMullen. The same thing is true when we're talking about the travel on Interstate 85. I take very well the questions that you put to opposing counsel, Your Honor. It's not just that he was traveling on Interstate 85. I traveled on Interstate to come up here to visit with all of you. The aggravating factor here was the time of day, and this also gets to your question, Justice Keenan, about what made this suspicious. We have lots of cases where travel on a drug corridor has been considered a factor contributing to reasonable suspicion. Is every interstate highway a drug corridor? No, Your Honor, but it is true. I think I get the point of your question. It frequently comes up. I think given how the interstate highway system is set up, drug traffickers routinely use those interstates to transport drugs. Right. And it is true that most major metropolitan areas are designated as either destination. And people traveling interstate use those interstate highways. Absolutely. That's why they built them. Yes, sir, absolutely, and that's why this is a very important component of saying we have to look at the totality of the circumstances. I would not stand before you and argue that because the appellant was on Interstate 85, or even that because he was on Interstate 85 and it was during the early morning hours, that that fact in and of itself meant the officers had reasonable suspicion. It was a known drug corridor, and I think that applies to every interstate highway. Every one of them is a known drug corridor because that's where they – known corridor for heavy trucks, interstate travelers, people going on vacation or whatever, business people. Yes, sir. They're all running up and down the interstate. I can only answer that question by saying I suspect that in some – You've got to have factors here that eliminate a bunch of people. Yes, sir. That's what you need to get you to focus. And we did. In our written submission, I can't put it any more simply than I did there. If you take the factors that are present here, how many individuals were traveling on Interstate 85 at about 1230 in the morning on a rental agreement that had – there was no way that the travel was going to be completed within the parameters of the rental agreement and refused to give our – Well, it was the next afternoon. It was due back in New York. It was due that afternoon, Your Honor. Well, that afternoon is 14 hours. Yes, sir. It was due 14 hours later in New York. You could drive from Charlotte to New York in 8 or 10 hours. You could. That answer and that fact was suspicious for a couple of additional factors. Number one, the vehicle was rented for three days. And remember, we are instructed to analyze this evidence and we're expected to give deference to the reasonable determinations of trained and experienced law enforcement officers. And here there's no question we're dealing with two officers that between them had 20 years' experience, and the record is they'd been involved in hundreds. I think the number is something in excess of 400 traffic stops that were either solely or primarily related to controlled substance investigations. So these guys are there on the side of the road, the officers. They see the rental agreement. The appellant, they know from looking at it that the vehicle is rented for three days. And for some odd reason, the appellant has not yet reached his destination two and a half days into that three-day rental period. I thought they said they'd stopped in Virginia Beach or something. There was some. His mother. That's correct. That's correct. But the question is not whether there is a possible innocent explanation but whether or not that fact could strike the officers as being odd. The even odder, the more suspicious part of it, was that the story the appellant told the officers about his intention, the court's already brought it up this morning, was that the destination was Charlotte and that they were going to stay in Charlotte for two to three days, clearly exceeding the ending time period of that rental agreement. Why is that suspicious? You just call Hertz and say, I need it for a few more days. Where is there anything in the evidence that that's suspicious? It's suspicious regarding criminal activity. Maybe poor business planning. Maybe not thinking, not being a responsible human being. But the criminal activity. Again, Your Honor, it's not whether or not there is a possible innocent explanation for the conduct. I'm just asking what's the possible criminal explanation for somebody who just is driving a rental car that their contract is going to be expiring. That happens all the time. And you call the rental car and say, I need more time on it. I think the main focus of the suspicion that surrounds the use of a rental car, and it's well documented in case law, is that drug traffickers frequently use rental vehicles. But you know, half the people who live in cities use rental cars. People who live in New York City, half of them don't own cars. It costs $800 a month to garage a car there. They don't do that when they only need it twice a month. They rent cars. So it seems to me that what we're doing is putting an overlay on some of these facts that talk maybe about how people live in the suburbs. You know, they don't drive at night. They don't drive in rental cars. But maybe you're trying to generalize that just because in a nice suburban neighborhood people don't do this, that people don't, as a matter of course, living in cities rent cars all the time. I mean, why is it suspicious? I just don't get it. The suspicion comes, again, from putting this into the totality of the circumstances. Every factor that any court has ever found amounting to reasonable suspicion can be divided and looked at individually to say, well, so what, they're on Interstate 85. I drive on Interstate 85 every day. So what, they're in a rental vehicle. Lots of innocent people use rental vehicles every day. So what, he couldn't provide or wouldn't provide an address. People get nervous around law enforcement or they live at P.O. boxes. But what we have to do is... You have to look at the whole thing. But what I'm saying is I just don't see anything suspicious about, other than the license thing, about somebody who's been visiting his mother in Charlotte, rents a car, car rental's going to expire. His brother gives a slightly different explanation for why they're there. Girlfriend says they're on vacation. The explanations aren't quite exact. But maybe these aren't the most precise people in the world. I mean, why is that a suspicion of criminal activity as opposed to these people may be, you know, some of life's less productive people, as opposed to criminal activity? Other than the fact that many courts have previously held that there is a connection between the use of a rental car and drug trafficking activity, there is nothing in and of itself that is inherently suspicious in the use or operation of a rental vehicle. And I'm not arguing that. I'm arguing the point that Justice Floyd brought up earlier, which is, and I gave it back to the court the same way I did in the written submission, if you use the factors that the district court accepted and you apply them to the members of the public who are using that particular... You're talking about those four factors that you laid out. Yes, sir. Those four factors and apply them to the general motoring public on that roadway during the early morning hours, the district court's opinion satisfies the requirement that this court has set forth, which is it must eliminate a substantial portion of the innocent traveling public. Yeah, this is a really close case. I mean, in my opinion, it's a close case. Can you give us a case of ours that was as close or closer where we upheld the stop on the basis of reasonable suspicion of criminal activity? I don't remember the cases off the top of my head. I know Judge Schroeder mentioned several in both of his opinions. Not all of those were... Right, but I'm asking you, can you identify four circuit cases that were as close as this or closer that we upheld the stop as being supported by reasonable suspicion of criminal activity? I can't name one off the top of my head, Your Honor, and I purposefully didn't attempt to memorize one because the... That's what we've got to deal with, though. I mean, we're kind of looking at the other cases, what our court has said before, and... I understand that, Your Honor. How come you all didn't produce that video earlier? The... Where they ended up contradicting the officer's testimony. The video of the first stop. Whatever it was, the audio part of it, I guess, contradicted the officer's testimony. There's no question that it... Directly. Yes, sir, it did. Which caused the credibility of your presentation to be undermined. It did, Your Honor. You had to come back and have another hearing. We did, much to my consternation. The focus... Three or four months later, you come up with this thing, which is Brady material. Maybe it's not Brady material in the... I would think it would be Brady material in the context of suppression motions, but... It certainly turned out to be Brady material. It is Brady material. I mean, I think you and I agree that it's Brady material, but it was three or four months after the judge had already written an opinion. Yes, sir. The explanation is that at the initial suppression hearing, what the officers provided, they were too literal. They were requested to provide all the discovery, including any video of the traffic stop of the appellant's vehicle. That's what they did. They provided me with the video from Deputy Russell's vehicle of the traffic stop on the side of the road. After the first hearing, Defense Counsel contacted me and said, my client insists that there should be or there is video from the traffic stop of the lead vehicle. Can you please inquire about that? I did. Deputy Soles eventually produced it. Deputy Soles is the one who brought to my attention the inconsistency. Actually, let me back up. What Deputy Soles alerted me to was the fact that he had video from his car of his participation in the traffic stop of the second vehicle, and he was going to produce that. He then alerted me to the fact, Deputy Soles, that he had video of his interaction with the driver of the lead vehicle, and that DVD contradicted his earlier testimony. So it's the deputy himself that brought to my attention the fact that he was mistaken in his earlier testimony. As soon as I found out that there was such a DVD, it was produced for the defense. Second, the motion for reconsider was made. The first version sounded like the suspect was lying, and the second version sounded like the officer was lying. Yes, sir. I can't contest that. The only other point that I want to make to the court, I think it's crucial, especially here, whether reasonable people can agree or disagree about how close the facts are here, is what I would call a very favorable standard for the district court at this point. I did scribble down some of those. The Supreme Court has said the government's requirement is to show a minimal, minimal level of objective justification. The Supreme Court has also articulated that reasonable suspicion, perhaps this gets to your earlier question and I should have forwarded this then, reasonable suspicion is considerably less than a preponderance of the evidence, considerably. And our argument is simple. Given these factors. But the traffic stop is completed. In that Rodriguez case they said it's completed when they would have been completed here when they gave him his ticket. His warning ticket, right? Go ahead, I'm going to finish. It would have been completed at 1254, the time she gave. We're not, if I understand your question, Your Honor, we're not making any kind of de minimis. Right, I understand. But doesn't that impact on this whole thing pretty substantially? If I'm following your question, it does not, Your Honor. You're saying Rodriguez doesn't have anything to do with it. No, sir. It only impacts the alternative ground. That's correct. But you still held him there for two and a half minutes. Based upon their reasonable suspicion. So, once again, we're back to the argument both sides have briefed and both sides have argued this morning. It turns upon whether there was, in fact, reasonable suspicion. We say the district court. For criminal activity. For criminal activity, yes, sir. And we're not talking about speeding. Not talking about speeding. Not talking about the speeding. No, sir. Okay. Thank you, Your Honor. Thank you. Appreciate it very much. Now, Ms. Will, you get another chance. Thank you, Your Honors, and I'll be brief. Again, this court's precedent and the rule is that there needs to be objective, reasonable suspicion of criminal activity in order to extend a routine traffic stop into a drug investigation. The government, again, has simply failed to show any case by the circuit that has specified these kind of set of flimsy factors that would indicate reasonable suspicion of criminal activity. These factors are of such benign quality that they could be applied to anybody on the roadway and would not eliminate a substantial portion of innocent travelers. The police officers would be able to point to SUVs, dark windows, a variety of other factors and claim that that is enough to make reasonable suspicion. Again, this is a totality of circumstances test under a one-stop analysis. However, under a two-stop analysis, it's only a totality of circumstances test if there is, should be the standard that if there is a new articulable reasonable suspicion in order to justify detaining the individual again after the first stop had been completed. In this case, there is no reasonable suspicion of criminal activity. The four factors are not enough to show any kind of sinister activity and therefore Mr. Williams' Fourth Amendment rights were violated. Unless this court has any other further questions. Thank you, Your Honors. We appreciate it very much and we commend you and Professor Brackenridge and the efforts of your fine law school assistants in this case. We'll come down and greet counsel and take a short break.
judges: Robert B. King, Barbara Milano Keenan, Henry F. Floyd